UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

_____
                                                      )
JONATHAN MULLANE,                      )
                     Plaintiff,                 )
          v.                                          )
                                                      )          C.A. No. 19-12379-DJC
UNITED STATES DEPARTMENT        )
OF JUSTICE, and UNITED STATES    )
SECURITIES AND EXCHANGE         )
COMMISSION,                                 )
                     Defendants.             )
_____)

**SUPPLEMENTAL AFFIDAVIT OF E. PETER MULLANE IN SUPPORT OF:**
  **(a)  MOTION FOR RECONSIDERATION OF ORDERS OF COURT [DE 66 AND 68];**
   **(b)  OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**
         **[DE 27 AND 69]; and**
   **(c)  PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**


        Now comes E. Peter Mullane, who being under oath hereby states as follows:

## <u>INTRODUCTION</u>

        1.      That I have been duly licensed as attorney by the Commonwealth of

Massachusetts since 1968, and presently maintain a law practice in Cambridge,

Massachusetts.

        2.      That for all times relevant hereto, and since the commencement of this

action on **November 19, 2019**, I have appeared as counsel of record for the Plaintiff in

this action.

        3.      The primary purpose and goal of this action remains that of providing the

Plaintiff all of the rights afforded to him under <u>both</u> the FOIA ("FOIA"), and the Privacy Act

of 1974, as amended ("Privacy Act" or "PA").  However, these rights can only be exercised

upon the actual providing and reviewing of <u>all</u> of the pertinent documents in the

possession of the Defendants.  Those documents include all those which relate to the

Plaintiff in any way, and to the brief semester-long internship he participated in at the USAO in Miami.

4.      The Privacy Act provides certain rights and protections to <u>all</u> individuals in three very important primary ways.  It provides every individual with:

- The right to request and receive copies of their records, subject only to any applicable specific Privacy Act exemptions.
- The right to request an expungement or any changes to any of their records that are not accurate, relevant, timely or complete; and
- The right to be protected against any unwarranted invasion of their privacy resulting from the collection, maintenance, use, or disclosure of their personal information.

5.      Unlike FOIA, <u>see</u> 5 U.S.C. § 552(a)(6)(A), the Privacy Act, 5 U.S.C. § 522a does <u>not</u> contain a requestor's right to an administrative appeal of any adverse determination that an agency makes on his access to records request.  However, since the government agencies involved must process an individual's access request under <u>both</u> statutes – which includes processing the request through any administrative appeal – there is no practical effect to this this distinction.  <u>See</u>, e.g., 28 C.F.R. § 16.45 (2014) (explaining DOJ Privacy Act regulation regarding appeals from denials of requests for access to records).  Also, see the following DOJ website:

https://www.justice.gov/archives/opcl/individuals-right-access.

6.      Therefore, the Defendants cannot simply rely upon any specific FOIA exemption alone to deny the Plaintiff access to any of his records under the Privacy Act. <u>See</u>,  U.S.C. § 522a(t)(1) (FOIA exemptions cannot defeat Privacy Act access); see also, <u>Martin v. Office of Special Counsel</u>, 819 F. 2d 1181, 1184 (D.C. Cir. 1987) ("If a FOIA exemption covers the documents, but a Privacy Act exemption does not, then the documents <u>must</u> be released under the Privacy Act." (emphasis added)); <u>Fagot v. FDIC</u>, 584 F. Supp. 1168, 1173 (D.P.R. 1984) ("[A]ccess to information that falls under both the

FOIA and the Privacy Act…is entitled to the cumulative result of what <u>both</u> statutes provide.") 760 F.2d 252 (1st Cir. 1985);  <u>Kearns v. Fed. Aviation Admin</u>., 312 F. Supp. 3rd 97, 106 (D.D.C. 2018) (concluding that although the intersection between FOIA and Privacy Act exemptions "sounds like a sphinxian riddle," [t]he interaction between the two statutes…boils down to a rather straight forward edict: "Where a request for documents is made under both FOIA and the Privacy Act, the responding agency must demonstrate that the documents fall within some exemption under <u>each</u> Act in order to deny access" (quoting <u>Barouch v. DOJ</u>, 962 F. Supp. 2nd 30, 66 (D.D.C. 2013)).

7.      Consequently, the rights and opportunities that the Plaintiff is ultimately entitled to hereunder is that of being able to seek appropriate amendments, corrections and misstatements that may appear and contained in any of these government documents.  This right also includes, but is not limited to, the ability to expunge any such materials as may be appropriate – either partially expunged or in their entirety.

8.      In this context, the Plaintiff's rights under the Privacy Act <u>and</u> FOIA would be *de facto* rendered null and void unless and until copies of <u>all</u> of these pertinent access documents and relevant sources of information have been completely and fully produced by the government in a timely manner.  This includes, of course, all of the documents being completely produced and formatted in a readable manner as to all of the contents contained therein.

## **FACTUAL BACKGROUND**

9.      On **December 25, 2020**, I filed an Affidavit in Support of the Opposition to Defendant's Motion for Summary Judgment [DE 47], which document is hereby incorporated fully herein by reference in its entirety and made a part hereof, with particular

reference to the conflicts of interest involving government counsel in the Boston USAO and the other related government agencies.

10.     The Court's Order of **March 19, 2021**, in essence determined that there was insufficient evidence to support even a "good faith" <u>dispute</u> as to whether or not there existed any "bad faith" conduct that was engaged in by the Defendants in this matter.  In support thereof, the Court relied in material part on the following which appears in the Order on page 10 thereof:

> Mullane asserts the DOJ has "successfully perpetrated a fraud" in <u>Breaking Media</u>, as well as this matter, and "knowingly committed as obstruction of justice" by withholding responsive documents that would lead to a different outcome in that case. D. 44 at 8, 12. His only basis is conjecture about the temporal coincidence of the dismissal of <u>Breaking Media</u> and when the USAO-SDFL began its search for responsive documents. <u>Id.</u> at 8, 12, 17.  But **the claims against Judge Moreno and Lehr were dismissed on September 16, 2019, nearly four months before the USAO-SDFL processing began on January 8, 2020.**  <u>Breaking Media</u>. No. 18-cv-112618-PBS. (D. Mass. Sept. 16, 2016).  The remaining claims dismissed in January 2020 were only against Breaking Media, Inc., and a journalist, for defamation.  (Emphasis supplied.)

11.     Unfortunately, this was only a partial and incomplete recitation of the procedural history of this related <u>Moreno</u> case by the Court. This omission is quite understandable given the inordinate multiplicity of pleadings and docket entries. However, a complete review and discussion of the entire record that follows supports a finding that there indeed exists, at an absolute minimum, a "disputed issue" as to the existence of  Defendants "bad faith" throughout this FOIA/PA request process – together with the disputes as to additional material facts herein.

12.     The most important undisputed fact is noted in the government's own Declaration by Wilkinson [DE-28-2] submitted in support of their Motion for Summary Judgment.  This important basic fact is that the USAO in Miami was initially notified and

requested by EOUSA on **October 31, 2018,** to provide all of relevant documents in response to Plaintiff's FOIA and Privacy Act requests.   This EOUSA notice to the Miami USAO occurred several weeks after the filing by the Plaintiff of his requests under FOIA and the Privacy Act.  This fact is an important date for Court's consideration for all purposes in the discussion of all the issues set forth hereinafter.

13.     Several weeks following **November 17, 2018**, Plaintiff filed in the Suffolk Superior Court a civil action captioned <u>Jonathan Mullane v. Federico A. Moreno, et al.</u> This state action was subsequently removed by AUSA Jason Weida and entered in this court on **December 20, 2018**, being noted as Civil Action No. 18-12618-PBS-JGD (hereinafter, referred to as the "<u>Moreno</u>" case). (A copy of  <u>Moreno</u> docket sheet is attached and is referred to hereinafter as  "**EXHIBIT A**".)

14.     On **March 22, 2019**, AUSA Weida filed in <u>Moreno</u>, on behalf of his clients Moreno and former AUSA Lehr, a Motion to Dismiss for <u>Failure to State a Claim</u>  and for <u>Lack of Jurisdiction</u>  (**EXHIBIT A** - [DE 68, 71 and 74]).

15.     On **September 16, 2019**, I filed a motion (together with a proposed complaint) to intervene in the <u>Moreno</u> case pursuant to Rule 24(a)(2) of the Fed. R. Civ. P. (**EXHIBIT A** – [DE 138]).

16.     On that same date of **September 16, 2019**, the court coincidentally entered an Order of Dismissal of the complaint against the Defendants Moreno and the former AUSA Allison Lehr.

17.     The Order of Dismissal entered in the <u>Moreno</u> action by the court on **September 16, 2019**, was limited to and based upon a lack of personal jurisdiction.  In this regard, and up to this point in time the procedural history of the <u>Moreno</u> action recited by the Court in its Order is correct and accurate.   However, as will be more specifically

set forth hereinafter, these events unfortunately are a limited and incomplete recitation of the entire relevant history of the related Moreno proceedings.

18.     A review of the complete procedural history of the Moreno action, together with the additional facts as set forth hereinafter, actually supports a determination of "bad faith" of the part of the Defendants, thereby supporting a reconsideration of the Court's Orders [DE 66 and 68].

19.     On **September 17, 2019,** the day following the aforementioned initial Order of Dismissal, Plaintiff duly filed a Motion for Reconsideration of the said court's Order of Dismissal entered on **September 16, 2019** (**Exhibit A** - [DE 140]).

20.     As noted in the Moreno Docket (**EXHIBIT A**), there were many other related substantive pleadings subsequently filed by the parties during the period of time between **September 16, 2019**, to **January 6, 2020** (**EXHIBIT A** – [DE 134-164]).  Indeed, as the multiple docket entries appearing on **EXHIBIT A** demonstrate, AUSA Weida continued to aggressively defend the Moreno complaint for months after the entry of the initial Order of Dismissal on **September 16, 2019**.

21.     However, a detailed discussion as to the merits of any of those said rulings, findings and/or determinations thereof are not necessary for these reconsideration purposes.  But what is highly relevant is simply the existence of the many subsequent pleadings that were filed between **September 16th** and **January 6th.**  Collectively, they establish and demonstrate that the Miami USAO and others continued to subjectively believe that that the Moreno civil action remained a viable claim, and that it continued to pose a threat to the liability of AUSA Weida' clients, certainly and no doubt this was their belief at least through the court's order of **January 6, 2020** – and beyond.

22.     These FOIA/PA requests had been duly submitted by Plaintiff to these Defendants around **October 14, 2018.**  Unfortunately, with the passage of time and no meaningful responses, it became necessary to file this action on **November 19, 2019**. This was almost **one year after** following the dilatory conduct and the deliberate failure of the government to provide any meaningful responses to Plaintiff's initial FOIA and Privacy Act requests.

23.     Despite the Plaintiff having commenced this action, the formal FOIA/PA document request process intentionally and willfully continued to be delayed at least until **January 8, 2020** – also a fact not in dispute by the Defendants.  However, as will be further described hereinafter, these delays in providing the Plaintiff the pertinent documents had absolutely nothing to do with the Miami USAO being "too busy."   There certainly were numerous highly inappropriate (conflicts of interest) communications and discussions going on amongst government counsel and employees behind the scenes, which collectively explain the real reason for the delay during this period of time**.**   The real reason was that what should have been an independent process and timely response to Plaintiff's FOIA/PA requests, instead became unlawfully merged into the defense of the Moreno action.

24.     According to Ms. Marcenaros' Declaration [DE 28-1], she states that the first formal steps she took in response to the FOIA/PA notice from EOUSA did not occur until 15 months after the USAO in Miami was advised by the EOUSA to begin this document production process.  This inordinate delay included the fact that at this point 2 months had passed after this action had been commenced.  As will be discussed hereinafter, this statement on its face is simply not true, at least as it relates to other personnel within the Miami USAO.  There were in fact a lot of activity, communications and discussions

regarding the FOIA/PA requests of the Plaintiff that were going on within and without the

Miami USAO office from the initial notice received from EOUSA on **October 31, 2018**, up

to an including January 8, 2020 – and beyond.  Of course, the filing of the <u>Moreno</u> action

just a few weeks later in November of 2018, only heightened the urgency of deciding who

and what to do about this dilemma.  Simply ignoring Plaintiff's FOIA/PA request at this

point was never a practical option for them in these circumstance, nor would it be for any

USAO in such circumstances.

25.     Certainly, the Miami USAO, Moreno and Ms. Lehr, all had actual knowledge

of this FOIA/PA action once filed on **November 18, 2019.**  At that time AUSA Weida was

still appearing as counsel of record in the <u>Moreno</u> action on behalf of his clients Moreno

and Ms. Lehr.  Incredibly, and notwithstanding such a blatant conflict of interest, AUSA

Jason Weida (the extent of his  conflict of interest will be further discussed hereinafter)

proceeded to contemporaneously file his appearance of record on behalf of these

Defendants in this FOIA/PA action.

26.     AUSA Weida had an obvious "conflict of interest" in his capacity of acting

and appearing as counsel for <u>all</u> of the Defendants in <u>both</u> of these pending actions. He

had been in constant communication with his clients Moreno and Alison Lehr, while during

the same period of time improperly communicating with all of the others involved in and

having an affirmative legal obligation to provide timely and complete responses to the

Plaintiff's FOIA/PA requests.   AUSA Weida's clients, Moreno and Lehr, clearly had

conflicting interests and goals with respect to the timing and completeness of the

production of the documents in response to the Plaintiff's FOIA/PA requests.  **However,**

**the conflicting legal interests and obligations of the Agency Defendants in this**

**action was to comply and carry out their very specific statutory and ethical**

**obligations to timely, properly and completely respond to Plaintiff's FOIA/PA documents access requests.**   Therefore, the respective legal interests of the defendants in the <u>Moreno</u> action, and the Agency Defendants in the instant action, could not have been different - they were patently in conflict even to a layperson.

27.     There were of course immediate and quite alarming concerns about this obvious and inherent "conflicts of interest" having AUSA Jason Weida appearing for the defendants in the <u>Moreno</u> action, while contemporaneously appearing as counsel of record for the Defendants in this action.   My objection to his appearing in this action was simply that it was a classic textbook conflict of interest in fact. My concerns and my opinion as to his having a conflict of interest was timely expressed directly to him – and even <u>prior</u> to his filing an appearance in this action.   However, notwithstanding my admonition and request that he not appear, he arrogantly and stubbornly proceeded to file his personal appearance on behalf of these named Defendants [DE 6].   Later on, upon my subsequent energetic protests and discussions with his supervisor at the Boston USAO, it was agreed that AUSA Weida would finally withdraw his appearance - but he did not do so until **January 21, 2020** [DE-12].

28.     It was not until **January 6, 2020**, when the court in the <u>Moreno</u> action entered its final Order (**EXHIBIT A** – [DE 164]) denying <u>both</u> the Plaintiff's pending Motion for Reconsideration (**EXHIBIT A** – [DE 140]) of its Dismissal of the Moreno action, and my pending motion and complaint to intervene (**EXHIBIT A** - [DE 138]),  that the Miami USAO in concert with the EOUSA, following certain discussions amongst themselves (**EXHIBIT D**), collectively and finally decided that it was then safe to proceed with initiating a more formal intra-office process requesting the pertinent FOIA/PA response documents.

29.     The identity of the AUSAs in the Miami USAO who finally authorized Ms. Marcenaros to finally proceed on **January 8, 2020,** remains unknown because those relevant emails continue to be unlawfully redacted—as noted in one such example **EXHIBIT D-1**.  Ms. Marcenaros was on the low rung of the bureaucratic ladder within the Miami USAO - being employed there only as an administrative assistant. **She clearly had no independent authority within that office to make a decision to proceed, or to not proceed, with responses to the FOIA/PA document production request they received from EOUSA back on October 31, 2018.   Particularly, this was not the kind of authority that gets delegated where it involved document production relating to pending claims and litigation against Moreno, Ms. Lehr, and others.**  They all knew each other personally, they all worked together within the same Miami federal courthouse building, and as described hereafter AUSA's within this office, they were all following, downloading and circulating every pleading and every step along the way in the <u>Moreno</u> case.

30.     Inexplicably,  there is not a single Declaration or Affidavit from any AUSA within the Miami USAO that has been submitted in support of summary judgment by the Defendants. After all, they are in the best position to explain and justify this unconscionable and highly unusual 15-month delay in their providing these requested documents.   What is known is that there certainly is one or more AUSA's within the Miami office possessing personal knowledge and with authority to provide this Court with the identities, copies of emails, correspondence, etc., of all the participants who were involved in that decision-making process, specifically including their interactions with AUSA Weida.

31.     Wilkinson's Declaration [DE-28-2] confirms that which has been previously stated in paragraph 6 above.  All records access requests from individuals are <u>always</u>

treated by <u>all</u> of the responding governmental agencies for all purposes therein as that of being a request submitted under <u>both</u> FOIA and the Privacy Act.  He confirms therein two important facts for purposes of the Court's further consideration:

- At paragraph 7:  "On that same date [**October 31, 2018**], EOUSA asked the Southern District of Florida (USAO-FLS) to conduct a search for material that is potentially responsive to Plaintiff's request;" and
- At paragraph 18: "The EOUSA processes **all** requests by individuals for records pertaining to themselves under **both** the Freedom of Information Act and the Privacy Acts in order to provide the requestor the **maximum disclosure authorized by law**."

32.     Approximately six (6) weeks <u>after</u> notifying the Miami USAO on **October 31, 2018**, the EOUSA sent correspondence to the Plaintiff on **December 18, 2018** (**EXHIBIT F-1**).  Therein they state that they are responding to his "Freedom of Information Act and/or Privacy request," but incredulously state that:

> 1.   **[X] A search for records in EOUSA – Personnel has revealed <u>no</u> responsive records regarding the above subject [Jonathan Mullane].**

33.     It is unknown if the genesis of this misrepresentation was that the Miami USAO upon receipt of their written notice from EOUSA on **October 31, 2018**, responded to the EOUSA stating that they had "no responsive documents."  However, regardless of the source that had been supposedly relied upon by EOUSA, this communication was indeed a serious and alarming misrepresentation made to the Plaintiff.

34.     Thereafter, Plaintiff appropriately complained in writing to the DOJ about having received this completely false misrepresentation.  Finally, on **April 10, 2019**, the DOJ **Office of Inspector General** ("OIG") then acknowledged the fact that there were, in fact, documents available to be produced in response to Plaintiff's FOIA/PA access requests (**EXHIBIT F-2**).

35.     There are other conspicuous omissions in the Defendant's supporting Declarations, and the omission of complete documents from their respective offices. Where are all of the communications back and forth that took place between and among the Miami USAO, EOUSA and AUSA Weida?   There were indeed communications amongst them concerning the status and/or explanations as to the ongoing decision of the Miami USAO to continue to delay their responses to EOUSA in producing the requested documents; after all, this was an unusually lengthy 15-months period of time.  It is simply not credible that after over a year's passage of time that the next and only communication between these offices was that noted in **EXHIBIT D** – conveniently being one on **January 8, 2020**.  Indeed, a complete lack of communication between these agencies/offices and AUSA Weida is of course not what really happened, as will be further discussed hereinafter.

36.     It can reasonably be assumed, based upon a review of the documents received to date, and as confirmed by AUSA Weida filing his appearance in this action, that both of these government offices (EOUSA and Miami USAO), together with AUSA Weida, early on became engaged in what can only be described as "conflicts of interest" by their communicating, collaborating, and cooperating with each other during most of this entire 15-month period.  These discussions no doubt specifically included from time-to-time the status of continuing the delay tactics and in that regard what was going on with the <u>Moreno</u> case.  Certainly, there were other discussions related thereto concerning the most advantageous timing for them to end their coordinated intentional delay in producing the requested FOIA/PA documents (**EXHIBIT- D-1**).

37.     Consequently, other than the completely redacted **EXHIBIT D -1**, where are these other related communications that were going on between these offices and AUSA Weida as they were dealing with and responding to this FOIA/PA request?  In addition to the delay and numerous unjustifiable redactions, the inexplicable omission of these documents collectively is much more than of great concern.  However, their conspicuous omission does serve to prove that there existed the necessity of a **<u>firewall</u>**, one that should have been established by the DOJ amongst these government attorneys immediately to avoid the "conflicts of interest" that permeated and irreparably destroyed the integrity of this FOIA/PA process.  What happened instead was that these FOIA/PA process and responses categorically lost their independence, and unlawfully became integrated into the tactics and litigation strategy of AUSA Weida's defense in the <u>Moreno</u> case.

38.     In this same context and concern, the Defendants submitted as support for their summary judgment the Declaration of McInerney [DE-28-3].  He too is not an attorney, and physically works in the Washington, DC FOIA office of the SEC.  He candidly acknowledges in paragraph 3 in his Declaration that the SEC received the Plaintiff's "**FOIA and Privacy Act** requests" on **October 14, 2018**.  Further, on page 2, paragraph 2, of his Supplemental Declaration [DE 57-3] submitted to the Court by the Defendants he states:

> **I have been <u>informed</u>** that the only documents that are reasonably <u>likely</u> to exist are emails, and that the persons who are reasonably <u>likely</u> to have responsive emails are **Lisa Roberts**, who coordinated the SEC's Student Honors Program, and **Eric Bustillo**, the Director of MIRO. (Emphasis supplied.)

39.     This is a rather terse Declaration from a layperson and at best is minimally informative. Therein he acknowledges that Lisa Roberts and Eric Bustillo, both attorneys

located and employed in the Miami SEC office during the time relevant hereto, "are reasonably likely to have responsive emails," and have the best, if not the only, direct access to the Plaintiff's requested FOIA/PA documents. The basis upon which he states that he was "**informed**" of this information quizzically remains from unknown sources. Further, while the McInerney does state that Roberts and Bustillo are "reasonably likely to have responsive emails," it conspicuously fails to state that those individuals are the **<u>only</u>** individuals to have responsive FOIA/PA documents—something which is the applicable legal test and standard in FOIA/PA cases. In other words, unless the agency's affidavits state that **<u>all</u>** of the FOIA/PA documents are likely located in the possession of Roberts and Bustillo (and the SEC cannot state that in "good faith"), the applicable legal standard for summary judgment has not been met here.

40.     But once again, *neither* of these two attorneys, who apparently are the only two (2) persons in the entire SEC who are known to have responsive FOIA/PA records, have produced any Declaration or Affidavit that one typically expects typically confirming that: they have made a diligent search for these requested records within their respective offices; acknowledging that they have produced and submitted to SEC FOIA Office in Washington <u>all</u> of the relevant requested documents; and as is appropriate in these circumstances to offer an explanation as why all of these requested documents were not been completely produced in a timely and a complete manner.  Was this just another "too busy" government office? Even worse, McInerney does not even work in the SEC's Miami office (he works and lives thousands of miles away in Washington, DC), and therefore could not possibly know: *who* has responsive FOIA/PA documents in Miami, and *who* is likely to know of the existence of such documents; *what* type of responsive FOIA/PA documents are likely to exist, and in which form (email, text, notes, letters, etc.); ***what***

**were the precise, specific search terms used (i.e., word-for-word)**; *where* those records are currently located; *when* those records were produced; *why* they were generated (i.e., the underlying context and/or circumstances); and ***how*** the FOIA/PA documents were searched for (i.e., did Roberts, who is currently a named defendant in the Moreno litigation, personally participate in the FOIA/PA searches? Did she conduct the searches herself? etc.).

41.    After all, these AUSAs and SEC attorneys are the primary source of information, and they are the persons who were in the best position to diligently search and timely produce the pertinent documents to respond to the Plaintiff's FOIA and Privacy Act requests.   The convenient omissions of their Declarations or Affidavits are but another reason to question the government's intent and actions in the context of the totality of these circumstances.

42.    Of great significance is the omission of any Affidavit, Declaration and the complete disclosure of documents from Lisa Roberts (who allegedly was the person who conducted the search in that Miami SEC office).  This is particularly disconcerting and alarming since it is known that there were communication(s) concerning the Plaintiff from Ms. Lehr to Ms. Roberts, which included a copy of the transcript sent by Ms. Lehr (being the only person other than the Plaintiff who had been in possession of same).  It was in fact those inter-office communications from Ms. Lehr to Ms. Roberts that was the direct cause of the Plaintiff's summer internship appointment being precipitously canceled by Ms. Roberts.

43.    It was the result of those omitted communications from Ms. Lehr, and those received by her from Ms. Roberts, that directly caused the following chain of retaliatory events and governmental misconduct (**EXHIBIT E**):

    (a)  (Exhibit E-1) - Email dated April 11, 2018: Plaintiff's background cleared for SEC summer internship.

    (b)  (Exhibit E-2) – Correspondence dated May 3, 2018 from Lisa Roberts, rescinding the Plaintiff's internship for failing background check.

    (c)  Exhibit E-3) – Email dated May 3, 2018, from Plaintiff to Lisa Robert, inquiring about the reasoning behind the rescinding of the SEC summer internship, with notation by Ms. Roberts to another that she does not intend to respond to Plaintiff's inquiry.

44.    These omitted communications between Ms. Roberts and Ms. Lehr are all important since they in fact confirm the true reason and impetus for Ms. Roberts' actions by precipitously and without cause terminating the Plaintiff's SEC summer internship on May 3rd.  This outrageous misconduct, and the direct consequences thereof was all part of Ms. Lehr's malicious pursuit of causing as much harm to the Plaintiff as she possibly could.  Her unstable mental health and capacity for irrational conduct is further exemplified by her actions and erratic behavior as evidenced and attested to in **EXHIBIT I-2**.

45.    Consequently, the Agency Defendants have acted intentionally and willfully in tactically omitting Declarations or Affidavits from persons who were in the best position and based upon their personal knowledge.

46.    The Defendants have offered no credible, non-hearsay or direct evidence that would be admissible at a trial in these circumstances.  Given the intentional and willful delays, together with the blatant conflicts of interest that were unabashedly pursued by government counsel throughout this period of time to avoid the FOIA/PA responses, these actions can only be viewed as self-serving and in essence became merged into the defense of the <u>Moreno</u> action.  This was a misguided and veiled contrivance having as its goal to assist AUSA Weida in the defense of the <u>Moreno</u> litigation, thereby gaining improper and unfair litigation tactics.

47.    Another undisputed fact arises based upon a reading of the limited and highly redacted document production that has been received to date.  Despite the

Defendants protests to the contrary, there indeed was plenty of time and the availability of personnel within the Miami USAO to timely respond to the FOIA/PA access requests of the Plaintiff.  The FOIA/PA documents which the DOJ has produced to-date proves that the agency had the luxury of time to engage in a very careful and diligent tracking, reviewing, and downloading copies of all of the court events and filings that were happening in the said Moreno action in Massachusetts during this entire 15-month period of time.  This fact is also undisputed, confirmed, and evident from the government's own Declarations filed in support of its motion for summary judgment, and certain emails as further noted hereinafter.

48.     Another source of a direct contradiction to the Defendants assertion that their delay was created due to the Miami USAO being "too busy," can be found within the attached emails of AUSA James Weinkle (USAFLS), dated **October 2, 2019** (**EXHIBIT B-1**).  Therein he is advising multiple personnel within his Miami USAO Office (specifically including the former AUSA Alison Lehr notwithstanding her then being a named defendant in the Moreno action).  This particular email circulation of his, and not the only one, was sent just several weeks after the aforementioned initial dismissal of that Moreno complaint on **September 16, 2019**. Most incredibly, AUSA Weinkle includes in his email circulation attachments of the copies of the then most current docket sheet, and the pleadings and orders that had been entered in the Moreno action.  His diligent observations and perhaps an astute comment on the Moreno action are set forth therein as follows:

>   While the Court in the D. Massachusetts has entered an Order Dismissing
>   Allison Lehr and Judge Moreno (DE 134), Mr. Mullane has filed a motion
>   that indicates he will appeal that Order (DE 145).  While the Government
>   has filed a response (DE 156), the Court has not yet ruled.

Additionally, see another email of AUSA Weinkle on **December 20, 2019**

(**EXHIBIT B-2**), to Ms. Lehr and others stating therein that:

> As an FYI (and this is NOT directly related to Mullane's FOIA request), the above-referenced Lit. Hold I instituted remains in effect.  I just checked the D. Mass docket and <u>the case is still active</u>…. A copy of the Docket Sheet is attached.

49. Also, see the email string on this same date of **December 20, 2019**, among AUSA

Weida, Ms. Marcenaros and others within the Miami USAO, and including therein most

incredibly is the participant Francis Tricia (USAEO) (**EXHIBIT B-3**).   It is important to

place these particular email communications and their subject matter in their proper

"conflict of interest" perspective.  Of course, all AUSAs are subject to the same Rules

of Professional Responsibility as are private counsel—rules that the Court must uphold

and enforce.  In this context, **Rule 1.7:  Conflict of Interest** specifically states in

pertinent part:

> (a) …a lawyer shall <u>not</u> represent a client if the representation involves a concurrent conflict of interest.  A concurrent conflict of interest exists if:
> (1) the representation of one client will be **directly adverse to another client**….
> (2) there is a significant risk that the representation of one or more clients will be **materially limited by the lawyer's responsibilities to another client *or a third party***….

50. AUSA Weida at all times relevant hereto, and since November of 2018, acted as

defense counsel of record in the "unrelated" pending civil <u>Moreno</u> action. Therein, and

at all times relevant hereto, he has always been representing the interests of his

clients Moreno and Ms. Lehr. As with any counsel of record, Weida had an ethical duty

to act independently on behalf of both of them and with undivided loyalty.

51. In this action the government counsel who were involved with and representing these

Defendants (SEC and DOJ) as their clients also owed that duty to act independently

and with undivided loyalty to both of their clients (government agencies).  Their

professional ethical duty and obligations as their counsel for the SEC and DOJ was

that of assisting and ensuring that they would act in a timely manner as was required,

to complete their required document production with transparency, to the fullest extent

possible, and to be in full compliance with all of their statutory and ethical obligations

required of them under FOIA/PA.  To quote the Declaration of Wilkerson (EOUSA)

[DE-2]:

> "The EOUSA processes all requests by individuals for records pertaining to
> themselves under both Freedom of Information and the Privacy Act in order to
> <u>provide the requestor the maximum disclosure authorized by law</u>."

52. In this context, and despite AUSA Weida representing and acting as counsel of record

or Moreno and Lehr, he became engaged in directly communicating, cooperating and

coordinating with the other government counsel representing the SEC and DOJ.  After

all, these other government counsel were supposed to be acting with independence,

and with an undivided loyalty in representing only their respective clients that were

involved in preparing these FOIA/PA responses.  It is fair to state and assume that in

these circumstances, and while acting as defense counsel in the <u>Moreno</u> action, the

very last thing in the world that AUSA Weida would want to ensure would happen

would be for the SEC and DOJ (Miami USAO) to timely provide the Plaintiff "the

maximum disclosure authorized by law" – to engage in understatement.

53.  The obvious conflicts in the respective legal interests of Moreno and Lehr, to that of

the interests and legal obligations these particular Defendants (government agencies),

would have been patently obvious to *any* attorney in these circumstances. Therefore, it

defies logic as to why the supervisors of these government attorneys allowed this

unlawful and unethical interaction amongst governmental counsel to have taken place

- and for it to be going on for so long? The failure of any counsel to recognize and appreciate this obvious fact there existed a conflict of interest went far beyond that of it being attributable to that of negligence or malpractice.  These interactions consisted of deliberately entering into a conflict of interest. Even a layperson such as Ms. Marcenaros understood (and stated in writing) that even the involvement of Ms. Lehr in searching for and producing her own emails and documents (let alone her attorney) for the FOIA/PA document production process was highly inappropriate (**EXHIBIT C-1**).

54. Notwithstanding the knowledge of government counsel of the existence of these conflicts of interest, they nonetheless became actively engaged in pursuing a course of conduct coordinating and cooperating with each other in facilitating the timing, editing, and the collection of an undetermined number of these FOIA/PA document production events – all as noted herein.

55. The interests of the SEC and the DOJ Defendants in this FOIA/PA document production process could not possibly have been in a more direct conflict with the competing legal interests of Lehr and Moreno as defendants in the <u>Moreno</u> action.  In the usually and customary course of acting as defense counsel for Lehr and Moreno, it was the duty of AUSA Weida to attempt to protect, obscure, conceal, and not have disclosed any evidence of wrongdoing, or any documents that may or could negatively impact a finding of liability against his clients (Moreno and Lehr) for their misconduct.

56. Directly contrary to, and in conflict with, those interests and goals of Moreno and Lehr, and independent thereof, the SEC and DOJ had the affirmative legal and ethical obligation to provide in a timely manner  <u>all </u>of the requested documents in response to Plaintiff's FOIA/PA access document request.  All government counsel knew full well that many of these required FOIA/PA responses foreseeably would include documents

that would provide direct admissible evidence of liability against AUSA Weida's clients (Moreno and Lehr). Therefore, there was an unambiguous and clear ethical violation engaged in by all of these government counsel involved in facilitating such blatant conflicts of interest in these circumstances.

57. I have previously brought to the attention to this Court this "conflict of interest" behavior of counsel that in and of itself establishes the "bad faith" of the Defendants. The confirmation of this "conflict of interest" disqualification was of course that of AUSA Weida actually entering his appearance of record for these SEC and DOJ Defendants in this case [DE 6], while still appearing in the Moreno action. As previously noted, he did so despite my objecting, and directly requesting, for him not to do so. See, Aff. at DE-47.

62.     In December of 2019, at the time I first voiced my objection to AUSA Weida about his intent on filing of an appearance for these Defendants, and despite my over 50 years in the practice of law and thinking that I had seen everything, I could not at that time possibly imagine that this "conflict of interest" situation had already been going on amongst these government counsel for months. I could not have imagined at that time that the proverbial conflict of interest horse had already left the barn – and that this unacceptable unprofessional behavior actually involved counsel who are representing our own government and are role models for its values.

63.     These were not law partners in some fancy national law firm representing Fortune 500 companies jousting over billions of dollar, and in the heat of battle unwittingly go off the ethical reservation while trying to win. This litigation is about a young man who is a citizen of this country that is trying to restore his adult life and career that was irreparably harmed by the abusive inexcusable actions of certain government employees.

21

It should not even be a case that is in litigation, as there is an absolute duty for the government in these circumstances to right the wrong that was unjustifiably imposed upon this Plaintiff.

64.   What now appears conclusively, just from the reading and review of the limited document production received to date, is that AUSA Weida had *de facto* been representing these named Defendants all along.  The filing of his personal appearance in this action for the Defendants was merely a token confirmation of the attorney-client relationship that he already been established with them, and of course one that was a conflict of interest which had been going on for months off-the-record.

65.   Contained within **EXHIBIT B-3,** is further confirmation of this "conflict of interest" situation that had been going on amongst all these government counsel.  This is **Tricia Francis (USAEO in <u>Washington, DC</u>) directly emailing AUSA Jason Weida**, on January 20, 2019.  Of course the USAEO and the Miami USAO never should have permitted USAO Weida to participate or even communicate with them in any way related to their fulfilling their ongoing independent FOIA/PA process obligations.  Clearly, and at a minimum, a **<u>firewall</u>** for this purpose should immediately have been formally established and set-up by DOJ for this purpose and in these circumstances.  In any event, here is Tricia Francis (USAEO), communicating *directly* to AUSA Weida, stating in pertinent part:

> Subject:  RE:  FOIA Litigation with Jonathan Mullane
>
> Jason,
> …I reviewed the Complaint and prepared a draft again.  My last contact with SDFL was yesterday afternoon when I spoke to Lazaro, who was going to do additional research on the search/processing/release of that single page document I attached to yesterday's email. However, here is a draft of EOUSA's response to the paragraphs that relate to EOUSA.  If <u>you</u> can work with it, and <u>work with what the folks provide you from the district</u>…you may be able to have a file-ready Answer by 12/26....

66.    Another interesting aspect of a reading of this **EXHIBIT B-3**, being dated **December 20, 2019**, is that it is very clear from the content therein that the EOUSA, Weida and the Miami USAO ("the district") had all been cooperatively working all along in assembling, preparing and editing their intended responses to the Plaintiff's FOIA/PA document access request.  This is but another egregious example of AUSA Weida's actions in orchestrating these events in the interest of his clients (Moreno and Lehr), and the USAEO in Washington, DC and the Miami USAO allowing and facilitating his unlawful participation.  Despite the existence of these conflicts of interest, AUSA Weida nevertheless succeed in becoming an active participant and the main conductor in these FOIA/PA responses and the timing thereof.

67.    The content of this **EXHIBIT B-3** also directly conflicts with the Declaration of Ms. Marcenaros.  She represented to the Court that the response to the FOIA/PA process did not formally commence in the Miami USAO until **January 8, 2020**, because they were all "too busy" up until that date.  Obviously, that is a misrepresentation, another fairytale of these Defendants, and this assertion is unsupported by the actual facts. A reading of this **Exhibit B-3** makes it crystal clear that the preparation, reviewing and editing of the intended responsive FOIA/PA documents had been going on, supervised and channeled at all times directly through the approval of AUSA Jason Weida, an arrangement that had apparently been going on for months at this point in time.  Also noted therein are that these efforts included the ongoing participation of Laz Feliciano, who was yet another employee and Administrative Officer within the Miami USAO.

68.    *All* of this information directly conflicts with the incredulous misrepresentation made to this court by the Defendants that the Miami USAO was "too busy" until **January 8, 2020**, to deal with any the FOIA/PA requests of the Plaintiff.

69.     The frequent intra-office Miami USAO communications and update efforts undertaken by Weinkle and others provided constant updates reflecting their very careful and diligent following of the <u>Moreno</u> case developments.  Both Moreno and the former AUSA Alison Lehr were of course being constantly advised and updated by USAO Weida to all these proceeding and events that were taking place in this court (both in their <u>Moreno</u> action and in the FOIA/PA action before this Court).  Those updates and communication by AUSA Weida to his clients in the Moreno case were of course in the usual and customary course while acting as their counsel. Included in those communications was the notable celebratory response on **January 6, 2020** (**EXHIBIT B-4**), wherein Ms. Lehr prematurely states, "I feel as if I can/should dance a jig!"  However, Lehr employment with the government was terminated at a later date, apparently in part due to her criminally assaulting a process server in Miami (**EXHIBIT I-2**). Furthermore, if the Miami USAO were so overworked during this period of time, it is also difficult to comprehend why even the then United States Attorney herself (Ariana Fajardo-Orshan) was personally involved and updated as to events related to the Plaintiff's FOIA/PA requests. Her name is conspicuously noted on many of these email discussions relating to same.

70.     However, the government's failure to offer credible evidence from those having the best personal knowledge of all of these events and decision-making does support the need for conducting limited discovery.  We need to determine whatever omitted documents that still exist but have yet to be produced, to determine how much information/documents these Defendants continue to conceal, and to review in unredacted form all documents that have been produced.

The egregious conflict-of-interest situation has irreparably tainted the integrity of this entire FOIA/PA process and these document production efforts that have been undertaken to date.  Certainly, it is that of several factors that has caused the Defendants to forfeit any presumption of "good faith" and credibility as a matter of law.   This further inquiry may be undertaken through the Court's *in camera* documents inspection process at its discretion, through the discovery process by the parties, and/or eventually perhaps subjected to a more formal investigation in an effort to make those responsible for such deliberate dilatory actions, conflicts of interest, and misrepresentations to this Court be held appropriately accountable?

71.     Further evidencing that this 15-month delay of document production was intentional and willful appears in the email from Ms. Marcenaros to Alison Lehr, dated **January 9, 2020** (**EXHIBIT C-1**). There indicates there had been earlier meetings between the former AUSA Alison Lehr and Ms. Marcenaros.  What is evident and of interest in reading this Exhibit is that there were ongoing intra-office conversations between these two women involving the subject matter of this FOIA/PA request.  However, like many missing pieces to this document production, the substance and content of those prior conversations and meetings has not been produced or disclosed. They were, of course, well-acquainted with each other since they were working in the same USAO at all times during this 15-month period of stonewalling that had been going on.   Perhaps most interesting is that great credit is due to Ms. Marcenaros for attempting, even as a layperson and at that late date, to *de facto* create a voluntary **firewall** that would exclude Ms. Lehr from all of the document production process.  Of course, despite this very appropriate

recommendation it never happened as predictably Mr. Lehr refused to do so as is

noted hereinafter.  However, if a layperson such as Ms. Marcenaros can

understand and appreciate the obvious conflict-of-interest situation that existed, it

begs the question as to why DOJ had not imposed the same firewall limitations for

AUSA Weida and the others from Day One?

72.    Perhaps what is perhaps the most disconcerting about this particular

email exchange (**EXHIBIT C-1**), but certainly not surprising, is how an attorney in

Ms. Lehr's position and experience could express her intention to still control and

remain involved in the FOIA/PA document production process.   After all, she was a

named defendant in the Moreno case and already had the benefit of a 15-month

head start for her and others to engage in the preparation for this inevitable

document production event.  Indeed, as noted in the email exchange from Ms. Lehr

to Ms. Jacobus even as late as **February 12, 2019**, the very appropriate

admonition of Ms. Marcenaros to her not be involved in the document production

was apparently "intentionally and willfully" disregarded. (**EXHIBIT C-2**).

73.    This communication between Ms. Marcenaros and Ms. Lehr further

exemplifies and highlights the concerns and assumptions about what had been

going on in this Miami USAO during this intervening 15-month period of time. They

certainly knew as professionals and attorneys, and being well-experienced in the

document discovery and investigatory process, that these relevant documents that

were in their possession, custody, and control would ultimately have to be

produced in response to the Plaintiff's FOIA/PA requests – which certainly was no

secret within that USAO.

74.     If Ms. Lehr wanted to and did in fact inject herself <u>after</u> this formal process apparently began on January 8th, 2020, it also raises the question as what constraints were in place prior thereto to prevent inappropriate involvement in the document assembly process by Ms. Lehr and others in that USAO. Was there in place by the Miami USAO any formal or meaningful monitoring of, or prevention of, actions taken by her and others, upon their receipt of the notice by EOUSA on **October 31, 2018**?

75.     Of additional concern are the numerous documents and communications that logically should have been in existence within the system of documents, but have not been produced.  Perhaps a logical explanation is that in anticipation of these FOIA/PA requests certain communications and documents were intentionally transferred, used, and communicated via the private emails of certain personnel within the Miami USAO - without having any authority to do so since a litigation hold was in place.

76.     Most all of the documents that have been produced contain major editing, and/or involving improper and unlawful redactions.  The Defendants have asserted as a justification therefor the application of certain inappropriate and non-applicable FOIA exemptions.  As noted in paragraph 6 above, the Defendants can only justify such omissions and redactions by proving the existence of an applicable exemptions that applies under <u>both</u> FOIA and the Privacy - which is required to justify any such actions as a matter of law. However, not a single exemption that has been asserted by the Defendants can be shown to be an exemption provided under **<u>both</u>** FOIA and the Privacy Act as is required.

77.     An example of such completely and/or mostly redacted documents submitted to date includes, but is not limited to, a copy of an email chain dated **January 8, 2020** (**EXHIBIT D-1**).   These reciprocal emails were between and among Carlos Baurell (USAFLS), Tricia Francia (EOUSA in Washington, DC) and Francys Marcenaros (USAFLS) around **12:21 PM** on this date.  The noted subject matter is "**FOIA Litigation with Jonathan Mullane**."  Coincidentally, and most importantly, this is the exact same date of **January 8, 2020**, in which Ms. Marcenaros first initiated a request for FOIA/PA documents within the Miami USAO (also **EXHIBIT D-2**).  In this context, it is important to note that her email notification to the USAO Miami personnel was sent by her at **12:50 PM**, <u>after</u> she completed her email exchanges with Baurell (USAFLS) and Francia (EOUSA). However, these critical decision-making email discussions and exchanges, on what certainly was a very important date for this review and analysis, have been completely, totally and inappropriately redacted – this is certainly not an email exempt under <u>both</u> FOIA and the Privacy Act.

*78.*     Therefore, all of this delay, omissions, obfuscations, and misconduct by the government collectively begs the very important question why has the government worked so hard to obstruct and delay the judicial process in all of these cases?   Certainly, this is not the behavior that one expects that is consistent with a party who has nothing to hide, who employs complete candor and transparency, and has the integrity to participate in searching for and arriving at the truth – which is what should be the ultimate goal in all litigation.

79.     What would perhaps be of further assistance to the Court is for this Court to now order the Defendants to produce copies of all documents and communications that were exchanged and communicated between and among these Defendants, the Miami USAO and AUSA Jason Weida, from and after the initial request was sent to and received by the Miami USAO on **October 31, 2018**, including at least to produce these initially for their review *in camera*.

80.     The extent in which this intentional delay has indeed caused harm to the Plaintiff and to the court in the Defendants failing to produce documents in a timely and complete manner may be summarized only as follows.  At all times during the pending  Moreno litigation, and up until and even right after the time that the complaint and my motion to intervene were finally dismissed on **January 6, 2020**, to be perfectly candid it was totally and completely baffling to our family why such an uncivilized and mean-spirited effort was undertaken within the Miami USAO to create a hostile work environment (to engage in understatement) for the Plaintiff during his internship within their forfeiture department. It was even more puzzling to us how and why they seemingly were able to enlist the cooperation of a federal judge to become an unwitting participant in their unconscionable retaliatory misconduct—an event which is confirmed by AUSA Evelyn B. Sheehan's February 6, 2019 email: "**No good deed goes unpunished**. We should have fired for cause." See Bates No. EOUSA-2019-000468-01619. Indeed, the judge who presided over the Moreno case in Massachusetts specifically commented that, "I do not find it plausible these events could have taken place."

29

81.    Certainly, the actions undertaken to discourage and attempt to early terminate the Plaintiff's (Jonathan's) semester internship in the forfeiture department, together with their intentionally proceeding to maliciously sabotage his already committed summer internship with the SEC Office in Miami, were far beyond any rational or logical explanation that as parents we could understand. This is not civilized behavior that anyone would expect of well-educated professionals cooperatively working within any private or a government office (USAO) environment.  This level of abuse, misconduct and retaliatory behavior were particularly inexplicable to us as parents, particularly since Jonathan only a few more remaining weeks during that month of April of 2018 to serve and finish out his internship.

82.    In addition to the hostility extended to the Plaintiff within the USAO, what was also quite inexplicable to me was why any normal Federal Judge sitting in Miami, a man whom I had never appeared before in any capacity, nor a judge that I knew socially or ever heard of prior to this consequential April 10th hearing event that precipitated this litigation, would ever take it upon himself to willfully and maliciously denigrate my character personally, and to specifically disparage my professional competence and ethics before my own son, who was then only a naïve second year law student standing before him absolutely terrified and traumatized in what was his first time ever physically in any federal courtroom.

83.    Additionally, this court appearance event of the Plaintiff was beyond unusual as it was arranged as it took place in a federal courtroom, but as the direct result of Moreno personally calling directly to Plaintiff's cell phone and ordering the Plaintiff to appear in his court "tomorrow."  The audio of that personal telephone

communication remains in the possession of the Plaintiff, and is just another piece of the outlandish behavior and abuses that are all part of this story, and these are facts that one cannot readily make-up. Understandably, collectively all of those particular events continue to impact and traumatize not only the Plaintiff, but indeed all of us in our family.

84.    What is the most difficult aspect of these events to accept is that all of this took place within an environment of a federal courthouse and governmental employees, most of whom are professional and well-educated.  Off course to think that one serving as a federal judge would have the basic common sense not to have participated in their scheme to force Jonathan to voluntarily end his internship.

85.    Unfortunately, this is exactly what had happened factually in Moreno's courtroom as noted and memorialized in that now hearing transcript of **April 10, 2018.**  However, this governmental misconduct in the USAO even went further, before and after this hearing, including facilitating and ensuring that that Plaintiff's summer internship commitment with the SEC would be rescinded – which it was. This retaliatory misconduct even extended to Moreno contacting his law school, and Ms. Lehr providing an unjustified and factually unsupported poor review of his performance as an intern.  Her vindictive performance review was completely and totally undeserved, and merely reflected her own emotional instability – to engage in more understatement.

86.    Ms. Lehr even went to the extreme of facilitating that the court hearing transcript would get published on certain law news type websites to gratuitously cause further embarrassment and intensive emotional harm to the

Plaintiff.  Perhaps unanticipated, the article appearing the *Above the Law* (Breaking Media) was most defamatory and critical of the Moreno's actions during this hearing.

87.     Moreno had justifiably recused himself after this hearing in response to Plaintiff's motion for him to do so.  However, after having recused himself articles in Above the Law and another in LAW 360 were published several days thereafter. In reaction thereto, he then proceeded to gratuitously send a highly negative defamatory letter concerning the Plaintiff to his law school.  This extraordinary personally vindictive action by Moreno was apparently caused in the mistaken belief that it was the Plaintiff who had facilitated the publications of his hearing to personally embarrass him in retaliation.  The reality was that this was all part of the misconduct undertaken and spearheaded by the former AUSA Alison Lehr – she was the one responsible for those publications having taken place.  But these were just some of the many intended and unintended consequences of this outrageous misconduct and abuse, for which the harm to the Plaintiff continues on.

88.     This series of event all took place over a few short weeks, but it was as bad a nightmare, emotional trauma and embarrassment to us as parents and certainly to  any second-year law student should ever have to suffer through. All of these events  were unfair, unjustified, and unnecessary, and the ongoing conduct of these Defendants and counsel in creating more unnecessary abuse and harm, and their dilatory tactics are proverbially adding salt to the wound they have maliciously created.

89.     Consequently, it was not until <u>after</u> the hearing before this Court on **February 24, 2020**, and upon receiving some of the first tranches of documents

from the government that the missing dots of providing an explanation as to why these malicious, abusive and retaliatory events took place finally got connected.  It was only through reading these new documents collectively that slowly it began to get revealed the genesis of the otherwise completely inexplicable misbehavior undertaken by the named government defendants in the <u>Moreno</u> action.

90.     It then began to become clear that the genesis of this unconscionable misconduct and abusive arose out of a petty and highly unprofessional retaliation scheme undertaken against the Plaintiff personally, and for actions that he was never responsible for nor participated in.  All of these events of governmental misconduct arose out of the discovery of certain information by personnel within the USAO asset forfeiture department (that the Plaintiff had been assigned to as an intern).  The information that became the genesis for all of this governmental misconduct was that approximately a year and a half earlier in 2016, while I was participating as a defense counsel, I obtained a dismissal of an indictment against the government in a highly-publicized multi-billion dollar money laundering criminal case that was pending in that same U.S. District Court in Miami. Also, it had involved this same forfeiture department within the Miami USAO which had their appearance filed therein.

91.     That case involved allegations of the existence of a multi-million dollar money laundering scheme emanating out of Venezuela, and it involved a defendant who was a citizen of Venezuela.  Coincidentally, Moreno was also born and raised in Caracas, Venezuela, apparently until his college years when he arrived in the U.S. Indeed, the case (and my representation of the defendant therein) was the subject matter of a certain *Vice.com* and other articles which were

33

very critical of the government prosecutors in the Miami USAO, and which of course became a source of professional embarrassment for that office.

92.     Of particular interest to the Miami USAO and the D.O.J.'s Washington office forfeiture departments at the time was that the case involved many U.S. and international bank accounts, with billions of dollars remaining therein in deposits. Although this case was first commenced here in Boston, it was eventually transferred to Miami by Judge Sorokin.  Consequently, the case was ultimately heard in this very same U.S. District Court of Southern Florida (Miami) courthouse before Judge Marcia G. Cooke, and of course this involved the same Miami USAO. (See **EXHIBIT F-1**, being the cover Docket sheet of USA v. Acherman, et al., Case #: 1:15-cr-2-0840-MGG-1).

93.     This was at the time a high visibility and well publicized money laundering case – and particularly so within the Miami area having a very significant Venezuelan population. The case also related to events involving numerous well-known Venezuela elite.  In fact, the general subject matter disclosed in this indictment still remains the subject matter for ongoing investigations within the Miami USAO and elsewhere.  Also, this certainly was a case that the USAO and the D.O.J. office in Washington had initially anticipated potentially was going to result in a very large amount (billions of dollars) in forfeiture proceedings for them in numerous districts.

94.     Consequently, the dismissal of the Acherman case in **December of 2016,** by Judge Marcia G. Cooke was well publicized in the Miami area.  It was a highly contested and a very emotionally-charged case amongst all of participating

counsel on both sides.  There were many pleadings filed along the way supporting evidence of prosecutorial misconduct, evidence of <u>Brady</u> violations, etc.

95.      In this context, and from the initial documents finally produced by these Defendants just late last February and March of 2020, is when we first discovered that personnel with the Miami USAO were actually circulating emails amongst themselves with copies of a *Vice.com* media article entitled, "**How the Feds Blew a Case Against an Alleged South American Drug Money Launderer**" **(EXHIBIT F-2).**  Therein they are acknowledging their outrage and embarrassment concerning the connection of the intern (Plaintiff) in their forfeiture department being my son.  The <u>Acherman</u> events described in this news article obviously were now an untenable and embarrassing public relations event for their USAO forfeiture department that it unconscionably precipitated these subject events and the abusive retaliation scheme against the Plaintiff as described herein after he refused to voluntarily resign.

96.      With respect to these Lustgarten <u>Acherman</u> events the Plaintiff appropriately attempted to deal with this issue is a non-public manner. This is important and highly relevant information for purposes of the <u>Moreno</u> litigation, but is also relates to ongoing criminal investigations. Therefore, the Plaintiff requested that certain exhibits related thereto be filed under seal[1] in this action [DE 20].  The Defendants opposed and filed their opposition to these filings being under seal

---

[1] Federal law specifically prohibits the public disclosure of the identity of informants in ongoing criminal investigations.

[DE-22].  Consequently, the Plaintiff's motion to file under seal was unfortunately denied by this Court on **July 9, 2020** [DE 25] without a hearing.

97.     However, approximately 2 months thereafter on **September 20, 2020**, an article primarily was focused on the same Martin Lustgarten <u>Acherman</u>, containing certain of the same information and subject matter contained in the email of Evelyn B. Sheehan (USAFLS), "**intern's father represented one of these *targets/current cooperator* in the VZ matter**") (**EXHIBIT H-1**).  Therefore, the person that the Plaintiff had attempted to protect from public disclosure by moving to file under seal, unfortunately then was exposed in the article appearing in the Miami Herald.  The headline of the article appearing therein was entitled, "**<u>As Venezuela Spiraled into Impoverished Hellscape, Rich Expats Cashed In, Records Reveal</u>**."  (**EXHIBIT F-3**).  See,

https://www.miamiherald.com/news/nation-world/world/americas/article245623340.html  As noted in the subject matter of this article, Mr. Lustgarten Acherman was indeed at all times relevant a prominent and important individual of interest for the Miami USAO.  Unfortunately, it is this fact and coincidence that motivated and precipitated the government's misconduct and abuse in its misguided efforts and pursuit of unconscionable vicarious retaliation against the Plaintiff.

98.     Notwithstanding the foregoing, my involvement as defense counsel in the <u>Acherman</u> case had been properly and voluntarily disclosed by him to his internship supervisor (the former AUSA Alison Lehr) at the very beginning of his internship assignment in this forfeiture department.  However, it was not until shortly after the Plaintiff began his internship and this father-son connection was

made by others within that forfeiture department.  This became the catalyst that created a self-imposed crisis and perceived threat within that forfeiture department. Obviously, this sensitive topic and subject matter became fodder for office gossip, and therefore became a perceived personal embarrassment to the former AUSA Alison Lehr before her peers. It became an unacceptable source of professional criticism and embarrassment for Ms. Lehr having accepted the Plaintiff as an intern in their forfeiture department.

99.    At that point, Ms. Lehr apparently perceived the Plaintiff's continuance in the forfeiture department as a serious liability for her, and a potential threat to her AUSA career (as ultimately happened, her career did end in part due to the Moreno litigation, but including the additional reasons and behavior further described in **EXHIBIT J-2**).  This professional embarrassment was particularly true for Ms. Lehr since she was in a leadership position in the asset forfeiture department. In that capacity she had personally been responsible for selecting the Plaintiff for this internship in particular consideration of his finance/banking background.

100.    It now appears in retrospect that sometime during the early part of the month of February of 2018, the discovery of this father-son connection began to bubble to the surface in this forfeiture department.  The first overt sign of this began with the Plaintiff beginning to be verbally abused by one of the AUSA's in this forfeiture department seemingly for no apparent or explicable reason.  As a consequence thereof, and in the interest of resolving this uncomfortable work situation, the Plaintiff appropriately complained about this hostile work situation to

Ms. Lehr.  See the attached email from the Plaintiff to the former AUSA Alison

Lehr, dated February 21, 2018 (**EXHIBIT H-2**).

101.    This verbal abuse did not discourage the Plaintiff from continuing on

with his internship since he was enjoying it as noted in **EXHIBIT H-2**.  The

response he received from Ms. Lehr was that he should not be making such a

complaint to her as that could get discovered by a criminal defense attorney in a

case involving their office.  Obviously that response was not helpful and was not

true, but the next ploy undertaken by Ms. Lehr and others was that sometime

during the month March Ms. Lehr informed the Plaintiff that he should not bother to

come to the office anymore because there was "no longer a desk available" for him

to use.

102.    But the "no desk available" ploy still did not discourage the Plaintiff

since as he observed there was no credibility to that statement in fact. So, the next

ploy undertaken by Ms. Lehr was that of telling him that his internship was now

over with as it was completed.  However, since the Plaintiff was afraid to lose his

law school semester credits, he discussed this issue for confirmation directly with

the HR person at the USAO.  But HR informed the Plaintiff that he could remain

until the end of May—contradictory information the Plaintiff then communicated

back and provided to Ms. Lehr, seeking an explanation therefor.

103.     It was at this point out of frustration, with Ms. Lehr seemingly having

run out of options to force the Plaintiff to voluntarily end of his internship, that

another scheme was then devised by Ms. Lehr and Benjamin G. Greenberg.  They

enlisted Judge Moreno, a close friend and colleague of Greenberg, to discourage

the Plaintiff from remaining at the USAO.  As is now the subject matter of the

Moreno litigation, he unfortunately accommodated their wishes with his

unscheduled hearing on April 10, 2018.

104.    The confirmation of the existence this scheme can be found in the

attached **EXHIBIT I**.   Therein, it is clear that Ms. Lehr and her fellow workers were

aware of the planned and staged "roasting" of the Plaintiff by Moreno.  These

emails are going on almost contemporaneously with the hearing that took place

that same day.  They are obviously aware of the hearing taking place, despite the

fact it was unscheduled as previously noted, was precipitously arranged by a

personal call from Moreno to the Plaintiff's cell phone the day before, and the

subject matter of the hearing had absolutely nothing to do with the business or any

case involving the USAO.

105.    The hearing was also conducted with the knowledge and participation

of the then U.S. Attorney Benjamin G. Greenberg, as this was obliquely confirmed

by Moreno who stated during in this hearing that he had just spoken with Mr.

Greenberg. Following the hearing,  Ms. Lehr instructed the Plaintiff to meet with Mr.

Greenberg, and so the Plaintiff emailed Mr. Greenberg to meet as noted in

**EXHIBIT I** – but he never responded to Plaintiff's email to meet – for obvious

reasons. Additionally, Ms. Lehr also requested Plaintiff to immediately order a copy

of the transcript of the staged "roasting" hearing that just happened before Moreno.

She deceptively did so under the guise of telling him she was going to assist him in

dealing with the unfair and inappropriate treatment he had just encountered before

Moreno.   The Plaintiff dutifully complied with both requests of Ms. Lehr at that time.

Unfortunately, it was the copy of that transcript that he obtained and provided to her

at her request that was used by Ms. Lehr, as she had always intended, to become

the ultimate weapon against the Plaintiff.  She providing copies to Lisa Roberts (SEC) to cause Plaintiff's SEC internship rescinded, she provided a copies to two publishing companies to get the resulting defamatory law articles published, and used this information for jeopardizing the status of his being able to continue on with his present law school.

106.    Once again, what is obviously missing from the FOIA/PA document production are those emails that preceded and followed after the events involving this hearing from these same AUSAs, and including those of the U.S. Attorney Greenberg who departed this office shortly after the Moreno action was commenced.  Where are his emails relating to, leading up to, and following this Moreno hearing event?

107.    This was a malicious, staged hearing for the purpose of having the Plaintiff "roasted" by Moreno. These collective actions went beyond that of being outrageous and malicious, and for these so-called professionals to bully, intimidate and traumatize a naïve second year law student in this manner in totally and completely-inexcusable manner – it is simply beyond belief this could have happened in any civilized country.

108.    What is also revealing in the pettiness and embarrassing unprofessionalism that was involved in this retaliatory and vindictive abuse of the Plaintiff appears in the follow-up email chain (**EXHIBIT H-1**).  Therein, the former AUSA Alison Lehr and AUSA Evelyn B. Sheehan are expressing, sharing and exchanging their total disdain of the Plaintiff with the most incredibly uncivilized and unprofessional comments.  It begins with comments in reference to the Plaintiff with Ms. Lehr stating, **"spit spit spit,"** and which then gets responded to equally

offensively in the email chain by Ms. Sheehan with her like-kind comment of, **"Spit spit spit to INFINITY."**  One could not make-up these kind of uncivilized and highly unprofessional statements, even if one were writing a John Grisham novel.  This kind of obnoxious and unprofessional behavior by AUSA's exchanging emails within their offices in a USAO, would not be believable to any reader. This kind of vindictive, retaliatory and malicious governmental misconduct taking place within any USAO in the entire country is simply astounding.

109.    The direct consequence of all of this office drama was the series of inexcusable governmental misconduct events, and the unconscionable needless extreme personal abuse of the Plaintiff – all as described and noted herein. The goal and mission of Ms. Lehr and others was to not only to force an early termination of the Plaintiff's internship, but it also became the vicious and emotionally depraved pursuit of further retaliation to place his professional career in the greatest jeopardy that they were capable of creating – which goal they have unfortunately achieved quite successfully.

110.    This kind of irrational, unprofessional, and emotionally unstable behavior and conduct undertaken by former AUSA Alison Lehr was not isolated to these events.  It was further exemplified, demonstrated and exhibited by her similarly bizarre behavior while criminally resisting service of process (**EXHIBIT J-1 – DE 55**].  See a copy of the affidavit regarding this event being attached hereto as **EXHIBIT J-2.**  However, the additional service of process costs that were created by this dramatic and traumatic event were appropriately and subsequently awarded to the Plaintiff (**EXHIBIT J-1** [DE 72]).

111.    The substance and very critical information contained in all these very important documents (even with the limited production, redactions, etc.) noted and/or included herein collectively do support the facts and claims asserted and set forth in the Moreno complaint before Judge Saris in the District of Massachusetts. It is for this very reason that they clearly were not produced and/or timely disclosed to the Plaintiff prior to **January 6, 2020.**  In fact, only partial production and access has been made through this date.

112.    In this context, it would be pure speculation by *any* person as to whether or not had there been complete and timely disclosure, and performed with total transparency, and having the opportunity to include these documents as part of the record in the Moreno action, that it would, or would not, have altered the court's ultimate decision made on **January 6, 2020**.  The issue for this Court is *not* that of an analysis of the harm that may have been caused by such "bad faith" actions in not timely complying with their statutory obligations, but is the mere existence of their "bad faith" conduct that creates the government's forfeiture of asserting and maintaining any exemptions otherwise that may have been available to them as a matter of law.

113.    As noted hereinabove, it was specifically expressed by Judge Saris that she did not believe these events to be "plausible."   We certainly were not in a position prior to late February of 2020 to provide her with an explanation and documentary proof that demonstrates the source of the misguided motivation for this governmental abuse and misconduct.  However, as noted above, that speculative issue as to what the court may have done were these documents before it having been timely and completely produced, is irrelevant as to any

determination by this Court. The determinative issue is that of whether or not the

Defendants failed to timely act and produce all of the requested access documents

as required pursuant to <u>both</u> FOIA and the Privacy Act, and to have done so in the

exercise of "good faith" in a consideration of the totality of these circumstances.

114.   Certainly, one of the foreseeable harmful consequences for this

governmental misconduct was the necessity of having to subsequently incorporate

these material facts obtained after the fact from this previously withheld document

production into an untimely amended <u>Moreno</u> complaint that was then filed with the

U.S. District Court of Southern Florida on **March 27, 2020 (EXHIBIT G-1**).

Although this pending complaint was initially filed in Miami as was procedurally

required due to the personal jurisdiction issue raised here, the Eleventh Circuit

Court of Appeals has specially assigned this case to District Judge Abdul K. Kallon

from the U. S. District Court for the Northern District of Alabama.  Therefore, the

harm caused is that of unnecessarily extending this litigation into another

inconvenient forum at great expense, causing Judge Kallon to expend time and

effort that should have been avoided, and now the Plaintiff faces another 2-3 years

or more of unnecessary and wasteful litigation, for a case which has zero

meritorious defense and could have and should have been settled by the

government long ago.

115.   Indeed, had the Defendants produced these documents timely and with

complete transparency (as they were obligated to do), in all likelihood, there would have

been a mediation process undertaken and completed long ago—as had been wisely

recommended by Magistrate Judge Dein very early on in the <u>Moreno</u> case when it was

pending in this court. It would have ended the ongoing stress and the ongoing emotional

harm to the Plaintiff and his family, it would have lifted the burden of this and other courts

having to spend hours upon hours of reading, researching and writing during the course of

having to deal with all of these procedural technical nuances and niceties, as exemplified

by the myriad of pleadings that have unnecessarily been created as noted on these

attached docket sheets.  Perhaps as importantly, the timely production of these access

materials completely and transparently would have allowed the Plaintiff to have become a

member of the bar now being 2 years out of law school - as he has earned the right to be

and so well deserves.

<u>CONCLUSION</u>

116.    Certainly, the timely and proper response required by FOIA/PA would have

avoided most of this ongoing emotional, financial and career harm that is still being

caused to the Plaintiff as of this date.  This includes, but certainly not limited to, his

admission to the bars here in Massachusetts and Florida having now been a law school

graduate for over 2 years.

117.    The government clearly has not acted in "good faith" throughout this

FOIA and Privacy Act process going back to the initial requests of the Plaintiff on or

about October 14, 2018, and continuing thereafter right through the present date.

They have consistently delayed and obstructed the complete document production

process of this FOIA and Privacy Act record access to date and in "bad faith." The

reason and motivation thereof is the obvious self-serving reason of it being the

unlawful coordination with other government counsel and parties as part of their

litigation strategy attempting to assist in the so-called defense of the still ongoing

and pending Moreno action.

118.    Certainly, the government's behavior throughout has not been the pursuit of transparency, it not been consistent with a search for the facts and the truth, and it has not been consistent with that of even trying to be fair.  They have continued to play their proverbial shell game with these FOIA and Privacy Act document productions even as of today, and including their inappropriate tactic of hiding behind asserted and inapplicable exemption claims, etc.

119.    There can be little or no hope to have the bright light of justice again shine on our society today if we cannot rely upon our courts to exercise its duty in a fair and impartial manner.  The scales of justice always need to be balanced equally and for all parties. We must all insist upon our government adhering to the basic principles expressed so many years ago by President Lincoln in 1863 at Gettysburg, "that government of the people, by the people, for the people, shall not perish from the earth."  Otherwise, we are all doomed to the risk of being next in the same intractable position of the Plaintiff.  There are all too many of our citizens who find themselves with constitutional and/or statutory rights, but with no practical or affordable remedies to exercise their rights. There exists all too many forms of potential abuse that unfortunately is inherent in the overwhelming power, extraordinary financial resources, and of having the luxury of an endless amount time that our Government has at its disposal.

120.    We must always insist on a government that is transparent, that seeks to find the truth despite the nature of the disputes, that always provides for our safety, and that protects us from the kind of harm and abuse that has certainly occurred to the Plaintiff in these circumstances.  He has endured more than

enough of the government's inexcusable and seemingly endless pursuit of retaliation and abuse (now over 3 years of litigation), and they have unjustifiably figuratively "**spit**" on him all too long in these circumstances.  It is now long past time for a speedy, fair and just resolution of all of these issues – which the Plaintiff has always been willing to fully cooperate in that process going way back to the early suggestion and words of experience of Magistrate Judge Judith Dein.  In the context of fairness and justice, a very constructive and hopeful beginning will be for this Court to now order without any further delays or impediments the full and complete production of all of the FOIA and Privacy access documents that the Plaintiff has been entitled to since October of 2018.

SIGNED under the pains and penalties of perjury this 4th day of June, 2021.

/s/ E. Peter Mullane, Esq.

E. PETER MULLANE, ESQ.
BBO #360000
MULLANE, MICHEL & McINNES LLP
6 Bennett Street
Cambridge, MA 02138
Tel.: (617) 661-9000
Email: peter@3mlaw.com